UNITED STATES of America, Appellee,

v.

Donald Winston HARPER, John White, a/k/a Leroy J. Edwards, a/k/a Roy Edwards, Neil Wilson Rowe, Appellants.

UNITED STATES of America, Appellee,

v.

James Merrill BURDINE, Appellant.

UNITED STATES of America, Appellee,

v.

David Ray JENKINS and David Ramond Govus, a/k/a Sam, a/k/a Melvin Hawkins, Appellants.

UNITED STATES of America, Appellee,

v.

Donald Alfred BLACK, Gary Regan Talbert and Robert McNeill Herring, Appellants.

UNITED STATES of America, Appellee,

v.

Richard Lewis JACKSON and Michael Benjamin Forbes, Appellants.

Nos. 79–5016 to 79–5020.

United States Court of Appeals, Fourth Circuit.

Argued Aug. 22, 1979.

Decided Feb. 13, 1980.

Barry Nakell, Chapel Hill, N. C., for appellants in 79–5016 through 79–5020; Reber Boult, Atlanta, Ga., for appellant Herring (Steven A. Bernholz, Chapel Hill, N. C., on brief for appellants Black and Talbert; Robert Fierer, Atlanta, Ga., on brief for appellant Burdine; James K. Jenkins, Atlanta, Ga., on brief for appellants Harper and Rowe; Norman B. Kellum, Jr., and David P. Voerman, New Bern, N. C., on brief for appellants Jackson and Forbes; Edwin Marger, Atlanta, Ga., on brief for appellant Govus; Bruce H. Morris, Atlanta, Ga., on brief for appellant White; John W. Stokes, Atlanta, Ga., on brief for appellant Jenkins).

Herman E. Gaskins, Jr., Spec. Asst. U. S. Atty., Raleigh, N. C. (George M. Anderson, U. S. Atty., Raleigh, N. C., on brief), for appellee U. S. in 79–5016 through 79–5020.

Before BUTZNER, HALL and PHILLIPS, Circuit Judges.

K. K. HALL, Circuit Judge:

Appellants appeal their conviction for conspiracy to import marihuana in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 963. Each appellant was arrested at or near the scene of a Drug Enforcement Administration raid in an isolated area of North Carolina where 25 tons, some 400 bales, of South American marihuana were being unloaded

from a shrimping trawler. The vessel had been intercepted on the high seas, where its captain and crew agreed to assist in the successful raid at the delivery site. Primarily, appellants raise fourth amendment issues arising out of the interception of the vessel on the high seas, and two vehicular stops of defendants driving along a state highway one mile from the dirt access road to the site. Finding no error in these and the other issues raised, we affirm.

## I.

The facts leading up to this raid are discussed in part in *United States v. Coats*, 611 F.2d 37 (4th Cir. 1979). Those involving the discovery and boarding of the shrimping vessel, the LADY ELLEN, are there stated succinctly as follows:

[I]n January of 1978 the United States Coast Guard was engaged in patrolling the Caribbean sea lanes for general law enforcement purposes with a special emphasis on drug interdiction. On January 25th the Coast Guard Cutter ALERT spotted the LADY ELLEN, a fishing vessel of North Carolina registry, in the Mona Passage between the Dominican Republic and Puerto Rico. Following its policy of stopping all United States vessels less than two hundred fifty (250) feet in length, the crew of the ALERT stopped and boarded the LADY ELLEN and inquired of its master the vessel's destination and point of embarkation. At that point the master stated "you got me, I'm coming from Columbia and I have a load of marijuana on board." A search ensued which produced some twenty-five (25) tons of marijuana. . . .

The Coast Guard admittedly had no suspicion concerning criminal activities aboard the vessel.

*Id.* at 38, 39.

■ The propriety of that stop was never decided because we upheld the district court's ruling that appellant Coats had no standing to raise fourth amendment objections to it. Some of the appellants here have such standing,[1] and we hold that the stop and boarding was lawful, absent any particularized suspicion of criminal activity aboard, because it was undertaken as a systematic "border" stop and inquiry.

■ Stops and searches at established border checkpoints are reasonable *per se*, so that the fourth amendment's protection against *unreasonable* searches and seizures is not implicated.[2] The controlling standards are those of the statute granting authority to the government officials to conduct the search. *United States v. Bilir*, 592 F.2d 735 (4th Cir. 1979) *citing United States v. Ramsey*, 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977).

■ The Coast Guard's statutory authority and traditional role of policing vessels on the high seas is found in 14 U.S.C. § 89(a), and its historical antecedents. *See Maul v. United States*, 274 U.S. 501, 512–531, 47 S.Ct. 735, 739–746, 71 L.Ed. 1171 (1927)

---

1. In *Coats*, we indicated that the right of possession and control of the vessel was in "Sam." *Coats, supra*, at 40. The man referred to as "Sam" is appellant Govus.

2. In *United States v. Bilir*, 592 F.2d 735, we explained the rationale of allowing custom checks at places other than the territorial border.

While the justification for the relaxed [fourth amendment] standards is at its clearest with respect to searches at regular customs stations literally "on the border," it has long been recognized to apply as well to so-called "extended border searches," under which "border" is given a geographically flexible reading within limits of reason related to the underlying constitu-

tional concerns to protect against unreasonable searches. *See, e. g., Castillo-Garcia v. United States*, 424 F.2d 482 (9th Cir. 1970). The many difficulties that attend the attempt to intercept contraband and to apprehend increasingly mobile and sophisticated smugglers at the very borders of the country have of course given birth to the doctrine. It holds that some searches by customs officials, although conducted at points physically away from an actual border and removed in time from the precise time of importation, may nevertheless be treated as border searches. *Id.* (citing cases). The test of validity is one of reasonableness under the circumstances.
592 F.2d at 739, 740. (footnote omitted).

(concurring opinion of Mr. Justice Brandeis).

14 U.S.C. § 89(a)[3] reads in pertinent part,

The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

By its terms, the Coast Guard's authority to stop and board vessels on the high seas is plenary. *United States v. Warren*, 578 F.2d 1058, 1064 (5th Cir. 1978) (*en banc*). In *Warren*, the Fifth Circuit held, in an *en banc* decision, that § 89(a) authorizes discretionary boardings of American flag ships on the high seas, with no particularized suspicion about criminal activities aboard, in order to allow officers to conduct random safety and documentary inspections and, "to look for obvious customs and narcotics violations." *Id.* at 1065. See, *United States v. Cadena*, 585 F.2d 1252, 1262–63 (5th Cir. 1978).

We think the Coast Guard's exercise of its boarding authority in this case did not violate the fourth amendment.

■ First, the stop and boarding was not one made at the will and whim of the officer in the field. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979); *United States v. Martinez-Fuerte*, 428 U.S. 543, 566–67, 96 S.Ct. 3074, 3086–87, 49 L.Ed.2d 1116 (1976). It was undertaken pursuant to a policy adopted through the cooperation of several government agencies to stop all vessels sailing under the American flag which were equipped and of a size sufficient for large-scale smuggling operations which could not be easily detected along isolated areas of the United States coast. It was conducted at a checkpoint in waters well known as sea lanes for such clandestine operations. All vessels of that kind which passed the checkpoint were boarded. These boardings could have been made routinely at port without a particularized suspicion that contraband was being imported and we see no reason why systematic boardings on the high seas should be held unreasonable because they are made away from the border and port, albeit 800 miles at sea.

■ Second, the nondiscretionary stop and boarding of all vessels passing the checkpoint posed a minimal and, under the circumstances, a reasonably necessary intrusion on privacy interests. The vessel was a commercial vessel sailing on the high seas. Administrative and regulatory searches of commercial enterprises, and vessels generally, intrude on interests and expectations of privacy very different from those involving the integrity of persons and residences not subject to ongoing regulation. Relaxed fourth amendment standards have been approved for closely regulated industries historically subject to close supervision and inspection. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 270–72, 93 S.Ct. 2535, 2538–2539, 37 L.Ed.2d 596 (1973). Certain industries such as liquor and firearms have such a history of government oversight that no reasonable expectation of privacy exists within the industry.

■ Commercial shipping can be categorized another such enterprise. Since the beginning of the republic, federal officials have had the authority to board and inspect American flag ships. Persons who sail under the American flag accept the responsi-

---

**3.** This statute can be distinguished from one involving the authority of a customs officer to stop vessels and to broadly search "any person, trunk, package or cargo" for the purpose of collecting custom duties and enforcing revenue laws. 19 U.S.C. § 1581. *United States v. Warren*, 578 F.2d 1058, 1064–65, n. 4 (5th Cir. 1978). *See* 19 C.F.R. § 162.3(a)(2) (requiring probable cause for customs officers to board and search a vessel on the high seas). *See also* 19 U.S.C. § 482, cited in *United States v. Bilir*, 592 F.2d 735 (4th Cir. 1979).

bilities and the burdens when they elect to register their ships with the United States Coast Guard. Such regulatory inspections have their basis in the international law of the seas that requires each nation carefully to maintain the navigability and safety of its own commercial fleet as a condition of non-interference from other nations. *See United States v. Warren*, 578 F.2d at 1064–65. (Stop and boarding on high seas.) *But see, United States v. Piner*, 608 F.2d 358 (9th Cir. 1979) (Stop and boarding on San Francisco Bay.)

█ Further we think special considerations apply to the stop and boarding of a vessel on the high seas. The antecedent sailing of the vessel away from United States territorial waters, the probability of return to the United States by the vessel, the historical regulation of vessels on the high seas (and the consequent lowered expectation of privacy which prevails with respect to activities in that setting), as well as the practical difficulties of policing United States vessels on the high seas if some standard of prior suspicion is required, are factors which coalesce to make the search on the high seas a special case, in much the same sense that a border search is.

As contrasted to the citizen living on land and subject to the jurisdiction of numerous police departments and overlapping controls of several layers of government requiring the highest degree of procedural rights, a ship is easily lost upon the vast ocean and subject only to the control of the infrequent government vessels of her own country. Unlike the land-bound citizen who is in constant contact with government and police, the mobility and anonymity of the boat require that the government be able to exercise effective control when the opportunity presents itself. To require some particularized suspicion concerning individual vessels in order to carry out a systematic inspection of all vessels in some area of the sea would encourage outright flaunting of the navigation, safety and administrative laws of the United States at the expense of our government's sovereign obligation under international law to police its flag ships.

Finally, in all, we think the checkpoint stop and boarding of each vessel of a particular kind in a well-traveled sea lane on the high seas is not unlike roadside truck weigh-stations and inspection points which the Supreme Court has expressly approved as reasonable, nondiscretionary intrusions on privacy interests beyond the warrant and probable cause requirements of the fourth amendment. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, n. 26, 59 L.Ed.2d 660 (1979).

We now turn to the reasonableness of the stops of vehicles passing in the vicinity of the drug raid.

II.

When the vessel was ready to enter American waters, the crew was put in charge and continuous surveillance was maintained by aircraft of the Drug Enforcement Administration, United States Customs and the North Carolina State Bureau of Investigation.

The LADY ELLEN sailed to Morehead City where a man came on board to take over her navigation to the landing site. A flotilla of Customs patrol boats followed her from Morehead City toward a sparsely populated area along Back Creek several miles from Merriman. As they followed, officers in the patrol boats observed a light-colored 1970 or 1972 model Plymouth or Dodge on the bank at a bridge. The headlights of the automobile were turned on the boats as they passed. During the unloading operations, the master of the LADY ELLEN overheard radio warnings from an apparent lookout that small boats were speeding toward the site.

When alerted about the approaching boats, the supervisor of the operation ordered the master to sail the LADY ELLEN away from the dock northward to a getaway car but the vessel was intercepted by a patrol boat waiting upstream.

The aircraft pilots observed small boats sailing away from the LADY ELLEN and directed land units toward the place where those boats had docked. The agents closed

in on a clearing where they observed a frame house, a newly-constructed fish house and a newly-constructed dock on the water. They observed large trucks lined with black plastic and pickup trucks with campers and loading devices. Also, they saw a boat docked near the fish house which was stacked with bales of marihuana.

After the landing area was secured, a federal agent left to look for suspects who might be fleeing or helping others to flee via the only paved road with access to the site. He used an unmarked car and was accompanied by a state officer.

Just before dawn, at 5:45 a. m., the officer stationed the car three miles from the raid site, some seven-tenths of a mile from the dirt road leading into the site. The paved road ends, with no outlet, a few miles further in Merriman. The federal agent had some knowledge of the apparent lookout at the bridge, and, from the size and nature of the smuggling operation, he expected lookouts and other suspects would likely be in the general area seeking to escape.

The agent's checkpoint was not a road block; he concealed the car in the woods with a flasher light on the dashboard.

In the first hour, one car passed. It was stopped and the driver, a nurse going to work, was allowed to continue on her way.

The second car, arriving at 7:05 a. m., in the dawning light hours, was stopped. It was going in the direction of the raid site. It was a cream-colored 1972 Dodge. The officers were not in uniform and identified themselves, respectively, as federal and state law enforcement officers. The driver, appellant Talbert, was asked for his driver's license and car registration. He rendered a Georgia license and a car rental agreement showing the car was rented to a third party. He told the officers he was in the area for "hang gliding" sport. The state officer arrested him for an alcohol charge. Eventually, Talbert was implicated, charged and convicted in this criminal action.

As this questioning was being conducted, other police cars came to join the officers. Their cars created a visible checkpoint area as a third car approached the scene, driven by appellant Herring. The car was a grey, early 1970's model Plymouth. When he drove up to the police cars, he was asked for a license and car registration. He produced a Georgia driver's license and a rental agreement from the same car agency as Talbert's, showing his car was rented in the name of the same third party. When asked what he was doing in the area, he replied he was there to go "hang gliding." He volunteered to go to Morehead City for photographing and fingerprinting. Later he was implicated, charged and convicted.

█ Appellants Talbert and Herring argue that these stops were as intrusive and unreasonable to passing motorists as was the surprise discretionary stop in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), which the Supreme Court held to be unreasonable. They argue that here individual agents—with no supervisory approval, using unmarked cars and attired in plain clothes—stopped passing motorists for questioning with no particularized suspicion about their participation in illegal activity. Also, at least for the stop of the first appellant's car, it is emphasized that the concealment of their car and the surprise stop could not be fairly called a "checkpoint" stop since no prominent signs or evidence of official activity was visible to law-abiding motorists. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 545–46, 96 S.Ct. 3074, 3077–78, 49 L.Ed.2d 1116 (1976).

We think this analysis misses the mark. In *Prouse* the Supreme Court was concerned with random stops of vehicles made at the will and whim of officers in the field, where the officers have no reason to stop any particular vehicle, other than for general police surveillance.

Here, the problem is very different. The purpose of these stops was to arrest suspects for a known crime, not to discover evidence of undetected crimes by the happenstance of visual searches. A serious crime had been committed involving numerous participants, some of whom were known to be fleeing the scene along a route

reasonably expected to be used for their escape. Stopping all cars there was, under such circumstances, a necessary means of law enforcement, and as such, justifies the minimal intrusion on privacy rights posed to passing motorists.

■ The Fourth Amendment does not create barriers to reasonable law enforcement activities in the area of a detected crime.

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, [*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] recognizes that it may be the essence of good police work to adopt an intermediate response.

*Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). By virtue of the exigency of fleeing, perhaps dangerous, suspects, we think the stops of all persons found on a likely access route to the scene of the crime was reasonable, both in its purpose and in the manner it was conducted. *See United States v. Constantine*, 567 F.2d 266 (4th Cir. 1977) *cert. denied* 435 U.S. 926, 98 S.Ct. 1492, 55 L.Ed.2d 520 (1978); *United States v. Jackson*, 448 F.2d 963 (9th Cir. 1971).

### III.

In conclusion, we think the evidence obtained as a result of the vessel and vehicular stops in question was admissible against the appellants. We acknowledge the numerous issues raised by various appellants but find no reversible error in any of them.[4] Accordingly, the judgments of conviction are each affirmed.

*AFFIRMED.*

---

4. In *United States v. Coats*, 611 F.2d 37 (4th Cir. 1979) we decided the issue of jury selection and are here bound by it. We note that appellant Herring has filed a supplemental brief objecting to that opinion.