**UNITED STATES of America**

v.

**Bryant Keith MILLER.**

**Crim. No. M–80–0411.**

United States District Court,
D. Maryland.

Feb. 13, 1981.

Ellen L. Hollander, Asst. U. S. Atty., of Baltimore, Md., for plaintiff.

Stanley Reed, Asst. Federal Public Defender, of Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

Defendant was indicted for the November 6, 1980, robbery of the Union Trust Company, located at 6065 Moravia Park Road in Baltimore City. Pending before the court are defendant's motions to suppress identification evidence, custodial statements, and other fruits of an allegedly unlawful arrest.[1] A hearing on defendant's motions was held on January 16, 1981, at which time the court heard the testimony of Baltimore City Police Agent John Donald Smith and Officer James T. Shenk. For the purpose of defendant's motions, the parties also submitted a stipulation relating to the testimony of a number of other witnesses.[2] The court's findings and conclusions with respect to defendant's motions are set out below.

### I. The Investigatory Stop

The November 6, 1980, robbery of the Union Trust Company (the bank) was investigated by officers of the Baltimore City Police Department and agents of the Federal Bureau of Investigation (FBI). Baltimore City Police Officer Shenk was one of the first to arrive at the robbery scene, having responded to a radio call. At the bank, Officer Shenk interviewed Wanda Roberts, the teller who had been robbed. He obtained from Roberts a complete physical description of the robber. Officer Shenk also interviewed Robert Terziu, a maintenance employee of the shopping center where the bank is located. He learned from Terziu that the robber had made his "getaway" on a blue, ten speed bicycle. Officer Shenk recorded this information on

1. See Paper Nos. 9, 10 & 12.

2. Paper No. 18.

a standard police report and put out a description of the robbery over the police radio.

Both Officer Shenk and Agent Smith attended "roll call" on November 7, 1980, at 7:30 a. m., a meeting at which officers are informed of the crimes occurring during the preceding twenty-four to forty-eight hours. During roll call, those present were told of the Union Trust robbery. The description provided was as follows:

the suspect was a black male, eighteen to twenty years old, five feet six inches tall, 120 to 125 pounds, with a gold upper front tooth, last seen riding a blue, ten speed bicycle wearing a blue jacket and dark pants.

Agent Smith's assignment for November 7, 1980, was to patrol in uniform the Moravia Park Road area in a police vehicle commonly known as a "paddy wagon." Agent Smith had been with the Baltimore City Police Department for six years, and had been a police agent for two years. Agent Smith is a college graduate, and was appointed a police agent by the police commissioner after having completed successfully certain psychological and written examinations.

At approximately 9:40 a. m. Agent Smith was patrolling the 6200 block of Moravia Park Road. He parked the paddy wagon near the McDonald's which is about two blocks from the bank, intending to get a cup of coffee. At that time, while sitting in his vehicle, he spotted a blue, ten speed bicycle parked on the sidewalk next to the McDonald's. After observing the bicycle for some ten minutes from a distance of approximately twenty yards, Agent Smith saw a black male fitting the description of the bank robber exit the McDonald's and head toward the bicycle. He made eye contact with the youth who immediately made a 180 degree turn and walked the bicycle toward Moravia Park Road. At that point, a city bus pulled up and the youth boarded the bus with the bicycle. The weather on the morning of November 7, 1980, was sunny and mild, and from Agent Smith's observations the bicycle appeared to be in operable condition.

Agent Smith testified at the hearing that in his six years as a police officer he had never seen a person get on a bus with a bicycle. He further testified that he considered the youth's conduct suspicious and peculiar, because the youth quickly avoided Agent Smith's eyes and headed off toward Moravia Park Road. In light of these observations, and the fact that the youth matched the physical description of the robber and had a blue, ten speed bicycle, Agent Smith decided to follow the bus in his vehicle and radio for further information about the robbery suspect. Agent Smith also considered significant the fact that what he had just observed occurred within two blocks of the crime scene.

While following the bus toward Pulaski Highway, Agent Smith contacted the police dispatcher and asked to speak with the unit that had handled the call at the bank. Agent Smith then had two radio conversations with Officer Shenk who told him that the robber had a gold upper front tooth and did not have facial hair.[3] The fact that the robber did not have facial hair comported with Agent Smith's observations of the person who had boarded the bus with the bicycle. Agent Smith asked Officer Shenk to meet him at the intersection of Pulaski Highway and 62nd Street.

As the bus turned left at that intersection, Agent Smith turned on his vehicle police lights and the bus driver pulled over to the curb. When the bus had stopped, Agent Smith asked permission of the bus driver to question one of the passengers. There were four to five passengers on the bus.

Agent Smith approached the youth, who was near the midsection of the bus, and asked him why he had gotten on the bus with the bicycle. The youth responded that he had paid the driver an extra quarter to bring the bicycle on the bus. When the

---

**3.** Although Officer Shenk's testimony was a bit confused as to whether he told Agent Smith about the gold tooth during the first or second radio conversation, the court finds that Agent Smith knew that the robber had a gold tooth prior to the time he stopped the bus.

youth spoke, Agent Smith immediately noticed that he had a gold upper front tooth. At that point Agent Smith asked the youth for identification. The youth produced a driver's license, which indicated that he lived near the bank. After returning the youth's license Agent Smith asked the youth if he would mind getting off of the bus because Agent Smith wanted to examine the bicycle. The youth replied: "No, I wouldn't mind." Agent Smith then assisted the youth in getting the bicycle through the bus door.

The confrontation on the bus lasted two to three minutes. Agent Smith described the youth's tone as "friendly." Agent Smith never drew his weapon, and had no physical contact with the youth on the bus. Although he did not know whether the youth was armed, Agent Smith testified that he did not attempt to frisk or arrest the youth on the bus because of the presence of other passengers. Agent Smith did not tell the youth either that he had to or did not have to leave the bus. If, however, the youth had refused, Agent Smith would have placed him under arrest on the bus.

Approximately three minutes after Agent Smith and the youth left the bus, Officer Shenk arrived. He informed Agent Smith that the bicycle used by the robber had a "# 10" on it and had reflecting tape on the handle bars. Such markings were found on the youth's bicycle. Agent Smith then advised the youth that he would be "taken in" in connection with a "holdup" investigation. The youth responded: "You mean the Union Trust?". The youth was then patted down, advised of his *Miranda* rights, handcuffed, and placed with the bicycle in the rear of the paddy wagon.

On the way to the police station, Agent Smith and Officer Shenk stopped at the shopping center where the bank is located to reinterview Terziu. Leaving the youth and the bicycle inside the vehicle, the officers asked Terziu for a complete description of the bicycle used by the robber. Terziu was not shown the bicycle prior to his describing it to the officers. Terziu was subsequently shown the youth's bicycle and identified it as the one used by the robber. The bicycle was returned to the wagon and

the youth was again advised of his *Miranda* rights. The officers then proceeded directly to the police station.

Defendant presses several arguments in support of his contention that his arrest was unlawful. He first maintains that at the time Agent Smith stopped the bus, Agent Smith lacked probable cause to make an arrest. According to defendant, therefore, his "seizure" on the bus violated the Fourth Amendment. Defendant next argues that even though the facts may appear to have warranted an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the instant stop exceeded the scope of the *Terry* doctrine in two respects: (1) the *Terry* doctrine is inapplicable to investigatory stops concerning a suspect's past criminal conduct; and (2), the intrusion into defendant's privacy far exceeded the scope of *Terry* to the extent that his seizure constituted an unlawful arrest under *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

### A. Investigatory Stops and Prior Criminal Conduct

■ Defendant correctly points out that the Supreme Court has never expressly held that a police officer can make a *Terry* stop to investigate a suspect's prior criminal conduct. However, based on a review of *Terry's* progeny and other relevant authorities, the court concludes that an investigatory stop premised on an officer's particularized and articulable suspicions regarding a person's prior criminal act is supportable analytically under *Terry* and not *per se* unreasonable under the Fourth Amendment.

Chief Justice Warren's opinion in *Terry* sanctioned the seizure of an individual on less than probable cause either to arrest or to search. This result was reached by employing a bifurcated Fourth Amendment analysis which separated the warrant clause, with its probable cause requirement, from the Fourth Amendment's general prohibition against unreasonable searches and seizures. The Chief Justice reasoned as follows:

"[W]e deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures."

392 U.S. at 20, 88 S.Ct. at 1879 (footnote omitted).

Although focusing on the frisk rather than the stop, the Court approved a narrow exception to the traditional probable cause requirement for the purposes of crime prevention and police safety. 392 U.S. at 30–31, 88 S.Ct. at 1884–1885.

The scope of *Terry* was expanded significantly in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Unlike the situation in *Terry*, the police officer in *Adams* relied on an informant of questionable reliability, rather than upon his own observations of suspicious activity. 407 U.S. at 147, 92 S.Ct. at 1924. Moreover, it is arguable that the *Adams* court has extended the *Terry* exception to situations involving crime detection.

"In *Terry* this Court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' *Id.*, at 22, 88 S.Ct. at 1880. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur *or a criminal to escape.* On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response."

407 U.S. at 145, 92 S.Ct. at 1923. (emphasis supplied).

Professor LaFave has concluded that a *Terry*-type stop should be permitted "whenever an officer 'reasonably suspects that [the person to be stopped] has just committed, is committing, or is about to commit an offense.'" 3 W. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9(2)(a), at 21 (1978). The Fourth Circuit appears to have adopted such an approach in *United States v. Harper*, 617 F.2d 35 (4th Cir. 1980). In that case agents of the Drug Enforcement Administration and the United States Customs Service had followed a boat known to be carrying narcotics to its landing site. Shortly thereafter, the agents who had observed certain vehicles near the landing site, established a checkpoint on a nearby road. When vehicles approached the checkpoint, they were stopped and their occupants questioned. "The purpose of these stops was to *arrest suspects for a known crime*, not to discover evidence of undetected crimes by the happenstance of visual searches." 617 F.2d at 40 (emphasis supplied). Noting that "[t]he Fourth Amendment does not create barriers to reasonable law enforcement activities in the area of a detected crime," 617 F.2d at 41, the court held the stops to be reasonable under the circumstances.

Recently, in *United States v. Cortez*, —— U.S. ——, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), the Court considered the propriety of an investigatory stop of a motor vehicle for the purpose of questioning the occupants about their citizenship and immigration status. Writing for the Court, Chief Justice Berger held the stop at issue to be justified under *Terry*. The Chief Justice summarized the *Terry* rule as follows:

"An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."

—— U.S. at ——, 101 S.Ct. at 695 (footnote omitted).

The Chief Justice went on to comment, in a footnote accompanying the above-recited passage, that "[o]f course, an officer may stop and question a person if there is reasonable grounds to believe that person is *wanted for past criminal conduct.*" —— U.S. at ——, 101 S.Ct. at 695, n. 2 (emphasis supplied). Although this statement is

dicta, it was not controverted by the other Justices.

In light of the above, and simple logic, it would be absurd to consider reasonable under the Fourth Amendment a stop where the police officer is not even sure that a suspect is engaging in criminal activity, while at the same time find unreasonable a stop where the police officer is certain that a crime has been committed and has reasonable grounds to believe that the person to be stopped has committed it. The court holds, therefore, that an investigatory stop to question a suspect about prior criminal conduct is not *per se* unreasonable under the Fourth Amendment.

### B. *Reasonableness of the Instant Stop*

■ An investigative stop is generally permissible if "the police officer [can] point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1880. Both the Supreme Court[4] and the Fourth Circuit[5] have recognized and applied these principles in numerous cases.

■ In light of the facts presented above, it is apparent that Agent Smith had "a particularized and objective basis for suspecting" that defendant had robbed the bank at the time he stopped the bus. *United States v. Cortez*, —— U.S. at ——, 101 S.Ct. at 695. The information Agent Smith received at roll call, and over the radio from Officer Shenk, possessed sufficient "indicia of reliability" to justify his acting upon it. *Adams v. Williams*, 407 U.S. at 147, 92 S.Ct. at 1924. *See Whiteley v. Warden*, 401 U.S. 560, 564–65, 91 S.Ct. 1031, 1034–35, 28 L.Ed.2d 306 (1971); *United States v. Gaither*, 527 F.2d 456, 458 (4th Cir. 1975), *cert. denied*, 425 U.S. 952, 96 S.Ct. 1728, 48 L.Ed.2d 196 (1976). Drawing on his own experience and training as a police officer,

Agent Smith reasonably concluded that the youth he had observed exit the McDonald's and board the bus with a bicycle was likely to be the person who, less than twenty-four hours earlier, had robbed a bank approximately two blocks away. *See, e. g., United States v. Cortez*, —— U.S. at ——, 101 S.Ct. at 695; *United States v. Bull*, 565 F.2d 869, 870–71 (4th Cir. 1977), *cert. denied*, 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d 545 (1978).

The fact that Agent Smith executed an investigatory stop while defendant was riding in a public bus, rather than while riding in a private vehicle or walking along the street, does not render the stop unreasonable. This was not the sort of standardless, random stop made at the whim of the police officer that the Supreme Court condemned in *Delaware v. Prouse*, 440 U.S. at 661–63, 99 S.Ct. at 1400–01. Moreover, it would make little sense to find that defendant had greater privacy interests when riding on public transportation than he would have had if he were a passenger in a private vehicle. *See Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977); *United States v. Brignoni-Ponce*, 422 U.S. at 880–81, 889, 95 S.Ct. at 2579–80, 2584. *See generally Miles, From Terry to Mimms*: The Unacknowledged Erosion of Fourth Amendment Protections Surrounding Police-Citizen Confrontations, 16 *Am.Crim.L.Rev.* 127, 142–60 (1978). While there may have been a lesser degree of exigency than was present in *Harper*, "[i]t would have been poor police work indeed for an officer of [six] years' experience . . . to have failed to investigate," and to have permitted a person he reasonably suspected of having committed a bank robbery simply to ride away. *Terry v. Ohio*, 392 U.S. at 23, 88 S.Ct. at 1881.

■ Once the bus had been stopped, Agent Smith's intrusion into defendant's privacy was minimal. Agent Smith merely

---

4.  *See, e. g., United States v. Cortez*, —— U.S. at ——, 101 U.S. at 695; *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. at 1391, 1400, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975).

5.  *See, e. g., United States v. Dodier*, 630 F.2d 232, 234–35 (4th Cir. 1980); *United States v. Harper*, 617 F.2d at 40–41; *United States v. Constantine*, 567 F.2d 266, 267 (4th Cir. 1977), *cert. denied*, 435 U.S. 926, 98 S.Ct. 1492, 55 L.Ed.2d 520 (1978).

asked defendant why he had gotten on the bus with the bicycle. When defendant responded, and his gold upper tooth became observable, Agent Smith's reasonable suspicions ripened into probable cause to arrest. *See, e. g., Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). Since the initial intrusion was lawful, Agent Smith's observations of the gold tooth were not tainted. *See, e. g., Wong Sun v. United States,* 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963); *United States v. Hall,* 557 F.2d 1114, 1117 (5th Cir.), *cert. denied,* 434 U.S. 907, 98 S.Ct. 308, 54 L.Ed.2d 195 (1977). The fact that Agent Smith did not formally arrest defendant until after they had left the bus does not alter the result in this case. Agent Smith testified that he did not attempt to frisk or arrest defendant on the bus because of the presence of other passengers. Given the lawfulness of the initial intrusion, and defendant's subsequent arrest, the seizure of the blue bicycle as evidence of a crime is sustainable under either the plain view doctrine, *see, e. g., United States v. Sifuentes,* 504 F.2d 845, 848 (4th Cir. 1974), or as a search incident to a lawful arrest. *See, e. g., United States v. Robinson,* 414 U.S. 218, 224–26, 235, 94 S.Ct. 467, 471–73, 477, 38 L.Ed. 427 (1973). Further, since probable cause to arrest developed on the bus, the court need not decide whether defendant consented voluntarily to leave with the officer, *see United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), or whether Agent Smith could have ordered defendant to leave the bus absent probable cause to arrest. *See Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

For the reasons set out above, defendant's motion to suppress tangible and derivative evidence will be denied.

## II. The Custodial Statements

Defendant has also moved to suppress all statements made by him to the authorities on the grounds that they were (1) the fruits of an unlawful arrest; (2) obtained in violation of his *Miranda* rights; and (3) involuntarily made.

Defendant's first contention is without merit in light of the court's conclusion in section I above. As to the statement defendant made to Agent Smith after leaving the bus and upon being informed that he would be taken to the police station ("You mean the Union Trust?"), it was simply an "unsolicited voluntary remark made while in custody but not while under interrogation." *United States v. Sanders,* 631 F.2d 1309, 1316 (8th Cir. 1980). *See Rhode Island v. Innis,* 446 U.S. 291, 300–02, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980); *United States v. Hart,* 619 F.2d 325, 326–27 (4th Cir. 1980).

The court has examined in detail the parties' stipulation of witnesses' testimony concerning what occurred after defendant arrived at the police station on November 7, 1980.[6] The court finds that defendant was twice expressly informed of his *Miranda* rights; in the morning by Baltimore City Police Detective Raymond Moran, and in the afternoon by FBI Special Agent Samuel Wichner. On both occasions defendant was informed of his rights prior to any interrogation, and on both occasions defendant executed a waiver of rights form.[7] Having considered all "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused," *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979), *quoting Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), the court concludes that the government has carried its burden of demonstrating that defendant knowingly and intelligently waived his *Miranda* rights. *See Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977); *United States v. Wyatt,* 561 F.2d 1388, 1390–91 (4th Cir. 1977); *United States v. Grant,* 549 F.2d 942, 945–46 (4th Cir.), *cert. denied,* 432 U.S. 908, 97 S.Ct. 2955, 53 L.Ed.2d 1081 (1977).

---

**6.** Paper No. 18.

**7.** Government's Motion Exhibits 1 and 2.

■ The government also has the burden of proving that defendant's statements were made voluntarily, and must do so by a preponderance of the evidence. *United States v. Dodier,* 630 F.2d 232, 236 (4th Cir. 1980); *United States v. Johnson,* 495 F.2d 378, 382–83 (4th Cir.), *cert. denied,* 419 U.S. 860, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974). In determining whether defendant's statements were voluntarily made, the court must assess "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Defendant had been twice informed of his rights at the station house, and was not coerced or threatened in any manner. Further, defendant never indicated a desire to consult with or have an attorney present, and was permitted to speak privately with his mother by telephone for approximately twenty minutes. The fact that defendant was told that any cooperation on his part would be conveyed to the United States Attorney does not detract from the voluntariness of his statements. *United States v. Hart,* 619 F.2d at 326. Further, while defendant is young he did not appear to be overly intimidated by his surroundings. *See United States v. Wertz,* 625 F.2d 1128, 1134 (4th Cir. 1980). He had the presence of mind to invent an elaborate fabrication in an initial attempt to exculpate himself. Having examined and weighed all of the relevant factors, the court concludes that defendant's custodial statements were made freely and voluntarily. Accordingly, defendant's motion to suppress custodial statements will be denied.

### III. Identification Evidence

■ Subsequent to defendant's arrest, three witnesses were shown an array of six photographs by FBI Special Agent Emory Waters.[8] Defendant contends that the array, including the procedures used in displaying it, was "impermissibly suggestive,"

and that any identification testimony of these witnesses is, therefore, unreliable.

On November 12, 1980, Special Agent Waters showed the array to Wanda Roberts, the teller who had been robbed on November 6, 1980. After examining the photographs for a few moments, Roberts stated that she was "positive" and "100% sure" that the person in photograph number four, the defendant, was the man who had robbed her.[9] On the same day, Special Agent Waters showed the identical group of photographs to Gladys Hensley, a bank teller who was present during the robbery. After examining the photographs, Hensley stated that photograph number six, Keith T. Jones, looked like the individual who had robbed the bank on November 6, 1980. She advised Special Agent Waters, however, that she had only seen a side view of the robber when he was leaving the bank.[10]

On November 14, 1980, Special Agent Waters showed the same group of photographs to Robert Terziu, a maintenance employee at the shopping center where the bank is located. Terziu had provided Officer Shenk with a description of the robber's bicycle, and had subsequently identified the bicycle taken from defendant on November 7, 1980, as the one used by the robber. After viewing the photographs, Terziu stated that photograph number four, the defendant, was "possibly" the man he had seen leaving the bank. A few moments later, however, Terziu stated that the person in photograph number six, Keith T. Jones, could have been the robber.[11] When viewing the array, the witnesses were neither told that it contained a picture of the robbery suspect nor that they should select any particular photograph.

The court has examined the array shown to the witnesses and finds that it contains six photographs of young black males. All of the individuals have relatively short hair and none have any facial hair. Defendant's gold tooth is not observable in his photograph.

8. Government's Motion Exhibits 5A–5F.

9. Paper No. 18; Paper No. 9, Ex. 3.

10. Paper No. 18; Paper No. 9, Ex. 2.

11. Paper No. 18; Paper No. 9, Ex. 1.

Although Roberts was the only witness who was able to make a positive identification of defendant, it is apparent that neither the photographs themselves nor the techniques used in exhibiting them were "so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The photograph of defendant was not unique among those presented, and the use of only six photographs is not itself unduly suggestive. *See, e. g., United States v. Gantt,* 617 F.2d 831, 840 (D.C.Cir.1980); *United States v. Lawrence,* 499 F.2d 962, 963 (4th Cir. 1974). *Accord, Williams v. McKenzie,* 576 F.2d 566, 572 (4th Cir. 1978). Further, the witnesses were shown the photographs within eight days of the robbery. *See United States v. Marson,* 408 F.2d 644, 651 (4th Cir. 1968).

Since defendant has failed to make a threshold showing that the pretrial photographic array was "impermissibly suggestive," his motion to suppress identification evidence will be denied. The court will decide at trial whether the witnesses' ability to identify defendant is sufficiently reliable to permit an in-court identification. *See, e. g., Manson v. Braithwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972).

For the reasons set out above, it is this 13th day of February, 1981, ORDERED:

1. Defendant's motion to suppress tangible and derivative evidence is DENIED.

2. Defendant's motion to suppress custodial statements is DENIED.

3. Defendant's motion to suppress identification evidence is DENIED.

4. The Clerk is instructed to forward a copy of this Memorandum and Order to counsel for the parties.