**UNITED STATES of America, Plaintiff,**

v.

**Acay LAMPKINS, Defendant.**

**Crim. A. No. 92–68–JLL.**

United States District Court,
D. Delaware.

Jan. 6, 1993.

William C. Carpenter, Jr., U.S. Atty., and Beth Moskow–Schnoll, Asst. U.S. Atty., Dept. of Justice, Wilmington, DE, for plaintiff.

Kathleen A.T. Dassel, Asst. Federal Public Defender, Wilmington, DE, for defendant.

## OPINION

LATCHUM, Senior District Judge.

### I.  INTRODUCTION

On September 15, 1992, the grand jury for the District of Delaware returned an indictment against defendant Acay Lampkins for knowingly possessing a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1).[1]  Before the Court is defendant's motion pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure and Local Rule 5 to suppress the introduction into evidence of an Amedio Rossi .38 caliber revolver.  Defendant contends that the revolver constitutes the fruit of an illegal search and seizure conducted in violation of his Fourth and Fourteenth Amendment rights and is therefore inadmissible under the exclusionary rule.[2]  Motion of Defendant Lampkins To Suppress Evidence, D.I. 12.

---

**1.**  Section 922(g)(1) provides:

It shall be unlawful for any person—
(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year ...
to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.
18 U.S.C. § 922(g)(1).  Section 924(e)(1) states:
In the case of a person who violates § 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another shall be fined not more than $25,000 and imprisoned not less than fifteen years ...
18 U.S.C. § 924(e)(1).  The criminal complaint against Lampkins alleges that Lampkins has three prior felony convictions in the Superior Court of Delaware for New Castle County.  Criminal Complaint, Docket Item ("D.I.") 1.

**2.**  The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const. amend. IV.

## II. FINDINGS OF FACT

In accordance with Federal Rule of Criminal Procedure 12(e), which requires the trial court to state on the record its essential findings of fact, the Court hereby makes the following findings of fact. On the night of August 29, 1992, the Wilmington Police Department received an anonymous complaint that a man was brandishing a gun and threatening people in the vicinity of the 2300 block of Locust Street. Transcript of the Suppression Hearing (hereinafter referred to as "Trans."), D.I. 15, at 3, 27. Two cars were dispatched to the scene, that of Patrolmen Bailey and Rhoades and that of Sergeant Williams. *Id.* at 3–4, 27, 59. There is a discrepancy in the record as to whether Patrolmen Bailey and Rhoades or Sergeant Williams were the first to respond to the complaint.[3] However, the Court concludes that this discrepancy is immaterial to the disposition of the present motion.

Upon arriving at the scene, Bailey and Rhoades accosted an African American male who appeared frightened and startled. *Id.* at 27, 38–40, 60–62. He informed the officers that he had telephoned the police and that he had been threatened at gun point by a large African American male wearing dark clothes. He identified his assailant as "Acay" and stated that Acay had fled the scene in a black Camaro. However, the complainant refused to give his name or file a formal charge. *Id.* at 27–28, 37, 61. Patrolman Rhoades returned to his car and radioed in the description of the suspect "Acay". *Id.* at 28.

Sometime either before or after these events, Sergeant Williams, a twenty one-year veteran with the Wilmington Police Department, arrived on the scene. *Id.* at 37. According to Sergeant Williams, the complainant approached his car and informed him that "Acay Lampkins had pointed a weapon at him and had just pulled off in a black Camaro and went southbound on Locust and westbound on Vandever Avenue." *Id.* at 4. Williams testified that the complainant described the alleged assailant, Acay Lampkins, as a tall black male with a distinct growth of hair on his face who was wearing a black shirt and black pants. Williams also testified that the complainant informed him that the black Camaro driven by Lampkins was an older model with damage to the rear and that the car was very loud because it did not have a muffler. *Id.* Furthermore, Williams testified that the complainant appeared frightened and distressed. According to Sergeant Williams, the complainant told him that Acay Lampkins had threatened him at gunpoint a number of times in the past and that Acay Lampkins often "comes around in that block [ie. Locust Street] and pulls a gun on anybody that is out there and tries to take their money and drugs away from them." *Id.* at 5. Sergeant Williams also stated that he had known Acay Lampkins for approximately fifteen years, that he was familiar with Acay Lampkins' criminal history, and that the complainant's description of his assailant and the incident comported with what Sergeant Williams knew of Acay Lampkins. *Id.* at 5–6.

Although there is some conflict in the testimony of Sergeant Williams and Patrolmen Bailey and Rhoades as to the precise sequence of the following events, the record is clear that the following events took place. Sometime after Sergeant Williams and Patrolmen Bailey and Rhoades interviewed the complainant, they proceeded to conduct a search for the alleged assailant, Acay Lampkins. *Id.* at 6, 28, 62. Sergeant Williams drove off in pursuit of the assailant and headed west on Vandever Avenue and then north on Pine Street. *Id.* at 6–7. Patrolmen Bailey and Rhoades remained in the general vicinity and combed the area for the assailant. *Id.* at 28, 62. While the officers were conducting their search, the police dispatcher advised all other units in

---

**3.** Sergeant Williams testified that he was the first to arrive on the scene. Trans., D.I. 15 at 12. Patrolman Bailey, however, testified that he and Patrolman Rhoades were the first to arrive on the scene and that Sergeant Williams arrived thereafter. *Id.* at 37. To further confuse the matter, Patrolman Rhoades testified that he did not see nor speak to Sergeant Williams at the scene. *Id.* at 59–60.

the area to be on the look out for a late model black Camaro, driven by a black male named Acay Lampkins. *Id.* at 28, 62. Officer Craig Mayo responded to the dispatcher's radio transmission and radioed Patrolmen Bailey and Rhoades. *Id.* at 62. According to Patrolman Rhoades, Officer Mayo "stated that he was familiar with a subject by the name of Acay Lampkins, and that he does drive a vehicle that was described ... and told us that he had been known to resist and to fight police officers and for us to use caution." *Id.* at 62.

Approximately four minutes after he had interviewed the complainant, Sergeant Williams pulled up behind a late model black Camaro on 30th Street in Wilmington. Both the car and the driver matched the description given by the complainant. Williams recognized the driver as Acay Lampkins. *Id.* at 7. According to Williams' testimony, he continued to follow the vehicle and repeatedly radioed in his location and direction of travel. He also radioed in the license plate of the black Camaro and was informed by the dispatcher that the car was not registered to Acay Lampkins. By this time, Lampkins was driving erratically. Lampkins accelerated and ran a stop sign. Thereafter, a number of patrol cars responded to Sergeant Williams' radio transmission and were in pursuit of Lampkins. *Id.* at 7–9. Among the units responding were Patrolmen Bailey and Rhoades. *Id.* at 29.

Lampkins veered off the road into a gas station at the corner of 30th and Market Streets where the police converged upon him. *Id.* at 9, 29, 65–66. At that time, anywhere from five to ten police officers had arrived on the scene. *Id.* at 67. Consistent with Wilmington Police Department procedure for a felony car stop, the police officers took up positions around the black Camaro with their guns drawn. *Id.* Patrolman Bailey and another police officer approached the black Camaro and removed Lampkins. *Id.* Patrolman Bailey asked Lampkins for his driver's license, insurance card, and registration card. *Id.* at 20, 29. Lampkins was unable to produce any of these. *Id.* at 29. While this exchange was taking place, Sergeant Williams came for-

ward and identified the assailant as Acay Lampkins. *Id.* Patrolman Bailey then advised Lampkins to place his hands on the hood of the car and to spread his legs apart. Lampkins complied and Patrolman Bailey proceeded to conduct a pat-down search of Lampkins for weapons. *Id.* at 29–30. Bailey advised Lampkins that the police were responding to a complaint that a man, named "Acay" and fitting his description, was brandishing a gun in the 2300 block of Locust Street. *Id.* at 30. Although the police detected that Lampkins had been drinking due to the alcohol on his breath, he did not appear impaired and cooperated with them. *Id.* at 10–11, 30–31, 46–47, 56–57, 84.

However, the record is unclear as to what occurred next. Both Patrolman Bailey and Sergeant Williams testified that Patrolman Bailey asked Lampkins if the police could search the black Camaro for weapons and that Lampkins consented to the search. *Id.* at 10, 30–31. However, the police did not obtain a signed consent form from Lampkins. *Id.* at 50. Lampkins testified that he was never asked for consent to search the black Camaro and that he never consented to such a search. *Id.* at 80, 84–85. What is certain from the record is that thereafter Patrolman Bailey advised Patrolman Rhoades to search the black Camaro and that during his search Rhoades found an Amedio Rossi .38 caliber revolver under the driver's seat near the gear shift. *Id.* at 69–71. Lampkins was arrested and subsequently indicted.

## III. DISCUSSION AND CONCLUSIONS OF LAW

### A. *STANDING*

In its letter memorandum submitted to the Court on December 10, 1992, the United States argues that defendant Lampkins lacks standing to challenge the constitutionality of the search of the black Camaro. Letter Memorandum of United States Attorney's Office District of Delaware, (hereinafter referred to "U.S. Letter Memorandum"), D.I. 18 at 4–5. In support of its contention, the United States relies upon

the opinion of the United States Supreme Court in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) and its progeny. In *Rakas* the Court concluded that wrongful presence at the scene of the search does not confer standing upon the criminal defendant to object to the legality of the search. *Rakas,* 439 U.S. at 141, n. 9, 99 S.Ct. at 429, n. 9. Moreover, the Court expressly rejected a line of lower court cases which had held "that a person present in a stolen automobile at the time of a search may object to the lawfulness of the search of the automobile." *Id.* Accordingly, under established Supreme Court precedent a car thief does not have standing to attack the constitutionality of a search of the stolen car. This Court does not take issue with this well-established rule of law. However, for the reasons stated more fully below, this rule does not support the conclusion that defendant Lampkins lacks standing in the case *sub judice.* Therefore, the Court will consider the merits of Lampkins' motion to suppress.

■ First, Lampkins contests not only the search of the black Camaro but also the stop of the black Camaro. Letter Memorandum of Federal Public Defender District of Delaware, (hereinafter referred to as "Public Defender Letter Memorandum"), D.I. 17 at 5–11. Even assuming *arguendo* that Lampkins lacks standing to contest the search of the black Camaro, that does not preclude him from challenging the stop of the black Camaro. The test promulgated by the United States Supreme Court in *Rakas v. Illinois* for determining whether an individual possesses standing to contest a search or seizure is whether that person "has a legitimate expectation of privacy in the invaded place." 439 U.S. at 143, 99 S.Ct. at 430. In the subsequent case of *Delaware v. Prouse,* 440 U.S. 648, 662–63, 99 S.Ct. 1391, 1400–01, 59 L.Ed.2d 660 (1979), the Supreme Court held that persons have a legitimate expectation of

privacy when traveling in automobiles. The Court stated:

> An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to governmental regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed.

*Id.* As the foregoing passage from *Prouse* makes clear, an individual's right to be free from unreasonable governmental stops and detentions in his automobile travel is distinct from his right to contest an unreasonable search of his automobile. Governmental stops of the driver of the vehicle constitute a seizure of the person under the Fourth Amendment. An individual has standing to object to the seizure because he has a legitimate expectation of privacy in his person.[4] By contrast, governmental searches of an automobile constitute a search of property. An individual only has standing to contest a search of property when he has a legitimate expectation of privacy in the property searched. Under established Supreme Court precedent an individual has a legitimate expectation of privacy in the property searched only when he is in rightful possession of it. *Rakas v. Illinois,* 439 U.S. at 141 n. 9, 99 S.Ct. at 429 n. 9. Therefore, Lampkins' standing to contest the stop exists independent of whether or not he possesses standing to contest the search of the vehicle. If the

---

**4.** The Court in *Prouse* concluded that in cases such as the case *sub judice* "[t]he Fourth and Fourteenth Amendments are implicated because the stopping of an automobile and detaining its occupants constitute a 'seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." 440 U.S. at 653, 99 S.Ct. at 1396.

Court finds that the stop of the black Camaro constitutes an unconstitutional seizure, then the fruits of that seizure, to wit the .38 caliber Amedio Rossi revolver, are excluded under the exclusionary rule. *See generally Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

■ Second, the record does not support the government's contention that Lampkins lacks standing to challenge the search of the black Camaro. There is no evidence in the record to suggest that Lampkins stole or was in wrongful possession of the black Camaro that was the subject of the police search. Lampkins testified at the suppression hearing that the black Camaro belonged to Ronnie Mathis who had entrusted the car to him with instructions to repair the clutch rod. Trans., D.I. 15 at 77–78. The United States did not offer any evidence to contradict Lampkins' testimony, and there is no evidence in the record that the black Camaro was reported stolen. Furthermore, Patrolman Rhoades' testimony that Officer Craig Mayo radioed him and informed him that Acay Lampkins had driven the black Camaro in the past, is also further evidence that Lampkins was in rightful possession of the car. *See* Trans., D.I. 15, at 62. Although Lampkins testified that he was not given permission to drive the car, *Id.* at 77, this alone is not a sufficient basis upon which to conclude that Lampkins did not possess a legitimate expectation of privacy in the automobile. The Court is not prepared to extend the Supreme Court's decision in *Rakas* to deny standing to an agent who exceeds the scope of his agency and engages in a frolic. For it cannot be said that an agent loses his legitimate expectation of privacy in the automobile merely because the agent exceeds the scope of his agency in his use of the automobile. To so hold would eviscerate the Fourth Amendment. Accordingly, the Court holds that Lampkins possesses standing to contest the search of the black Camaro because he had a legitimate expectation of privacy in it.

## B. THE STOP AND SEARCH OF THE BLACK CAMARO

Both the United States and defendant Lampkins in their respective letter memorandum submitted to this Court have proceeded on the erroneous assumption that the automobile stop constituted a *Terry* stop. Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, the police may stop a suspect in the absence of probable cause in certain limited situations if, and only if, the police possess a reasonable articulable suspicion that criminal activity is afoot. *See United States v. Hensley*, 469 U.S. 221, 226–230, 105 S.Ct. 675, 678–81, 83 L.Ed.2d 604 (1985); *Florida v. Royer*, 460 U.S. 491, 498–501, 103 S.Ct. 1319, 1324–26, 75 L.Ed.2d 229 (1983); *Terry v. Ohio*, 392 U.S. at 29–31, 88 S.Ct. at 1884–85. Although the precise parameters of a *Terry* stop are incapable of facile bright line delineation because "[t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case ... [t]his much ... is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. at 500, 103 S.Ct. at 1325. These rules apply with equal vigor in the automobile context. *Delaware v. Prouse*, 440 U.S. at 662–63, 99 S.Ct. at 1400–01. In *Delaware v. Prouse*, the Supreme Court held "that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." *Id.* at 663, 99 S.Ct. at 1401.

■ Applying these blackletter rules to the case *sub judice*, the Court holds that

the police conduct exceeded the limited scope of investigation permitted under *Terry v. Ohio* and *Delaware v. Prouse* and their progeny. When Lampkins pulled into the gas station on the night of August 29, 1992, he was being pursued by anywhere from five to ten police officers. When Lampkins stopped the black Camaro, the officers took up positions around the black Camaro with their guns drawn. Two of the officers approached the car and removed him from it. Whatever the parameters of a *Terry* and *Prouse* type stop are, such conduct by the Wilmington police clearly exceeds them and constitutes a seizure of the defendant's person requiring probable cause.

Under *Terry v. Ohio* and *Delaware v. Prouse,* the police are permitted to stop and detain persons when they possess a reasonable articulable suspicion that they are violating the law. *See Terry,* 392 U.S. at 29–31, 88 S.Ct. at 1883–85 and *Prouse,* 440 U.S. at 662–63, 99 S.Ct. at 1400–01. The stop and detention envisioned in these two seminal cases is momentary and limited in nature. Indeed, one of the justifications for allowing the police to stop and detain persons with less than probable cause is that the stop and resulting detention are a brief intrusion circumscribed by law. *See Terry,* 392 U.S. at 17–18, 88 S.Ct. at 1877–78; *Prouse,* 440 U.S. at 653–55, 99 S.Ct. at 1395–97; *See also United States v. Martinez–Fuerte,* 428 U.S. 543, 557–58, 96 S.Ct. 3074, 3082–83, 49 L.Ed.2d 1116 (1976) (In holding that routine stops for brief questioning conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be supported by probable cause nor a reasonable articulable suspicion of unlawful activity, the Supreme Court placed considerable weight on the fact that such stops constitute a limited intrusion.). Moreover, in writing for a plurality of the Supreme Court in *Florida v. Royer,* Justice White stated that the police may not employ investigative techniques akin to formal arrest absent probable cause and thereafter seek to justify them under *Terry:*

> *Terry* and its progeny nevertheless created only limited exceptions to the general rule that seizures of the person require probable cause to arrest. Detentions may be "investigative" yet violative of the Fourth Amendment absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest. *Dunaway v. New York,* [442 U.S. 200, 211–13, 99 S.Ct. 2248, 2255–57, 60 L.Ed.2d 824 (1979)] made this clear.

*Florida v. Royer,* 460 U.S. at 499, 103 S.Ct. at 1325.

This Court today need not set forth with precision a bright line test to determine when a stop and detention exceeds the narrow scope permitted by *Terry* and *Prouse* and becomes a seizure of the person requiring probable cause. It is sufficient for the resolution of the case *sub judice* that defendant Lampkins was seized for the purposes of the Fourth Amendment when the police cornered him at the gas station, drew their weapons, and removed him from the black Camaro. At that point the seizure was no longer a limited *Terry* and *Prouse* type stop. In order to be constitutionally valid that seizure required probable cause. A seizure of an individual requires probable cause under the Fourth Amendment when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). In the case *sub judice,* any reasonable person when surrounded by between five and ten police officers, with their weapons fixed on him, would not feel free to leave. The fact that the police did not formally arrest Lampkins until after the search of the black Camaro is irrelevant to the inquiry. "The application of the Fourth Amendment requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an 'arrest' under state law ... Indeed, any 'exception' [to the probable cause

requirement] that could cover a seizure as intrusive as this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based upon probable cause." *Dunaway v. New York*, 442 U.S. 200, 212–13, 99 S.Ct. 2248, 2256–57, 60 L.Ed.2d 824 (1979).

■ The Court's determination that the stop of the black Camaro exceeded the scope of a limited *Terry* stop does not end the inquiry. The Court must consider whether the police, nonetheless, possessed the requisite probable cause to seize Lampkins and to search the black Camaro. For the reasons stated more fully below the Court holds that the police possessed the requisite probable cause to seize Lampkins and to search the black Camaro. Since the Court holds that probable cause existed the Court need not consider whether Lampkins consented to the search of the black Camaro.

Probable cause, like the standard for a *Terry* stop, is a fluid concept dependent upon the attending facts and circumstances of a given case. In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court per then Justice Rehnquist held that in determining whether an informant's tip establishes probable cause courts should consider the totality of the circumstances. *Id.* at 230, 103 S.Ct. at 2328. Among the factors to be considered under the totality of the circumstances test are: (1) the veracity of the informant; (2) the reliability of the informant; (3) the informant's basis of knowledge; (4) the extent of any independent verification of the informant's tip; (5) the quantity and quality of the information given to the police by the informant; (6) the quantity and quality of independent information possessed by the police. *Id.; see also Alabama v. White*, 496 U.S. 325, 328–32, 110 S.Ct. 2412, 2415–17, 110 L.Ed.2d 301 (1990); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). Although these factors do not constitute an exhaustive list, they are nonetheless salient and especially relevant in determining the existence of probable cause.

Applying the totality of the circumstances test to the case *sub judice*, the Court concludes that the police had probable cause to seize Lampkins and to search the black Camaro. The veracity and reliability of the complainant's tip is established by virtue of the fact the complainant's demeanor was observed by trained police officers on two separate occasions. Sergeant Williams personally interviewed the complainant as did Patrolmen Bailey and Rhoades. All three of the officers testified that the complainant was visibly disturbed and appeared frightened as he related to the officers that he had just been threatened at gun point. Although the anonymous complainant's statements are hearsay, their veracity and reliability is best illustrated by analogizing to Rule 803(2) of the Federal Rules of Evidence. That rule excludes from the general rule against the inadmissibility of hearsay, statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed.R.Evid. 803(2). As the advisory committee's note thereto comments, the rationale behind the rule "is simply that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." Fed. R.Evid. 803(2) advisory committee's note. These same considerations apply in ascertaining the veracity and reliability of the complainant in the case *sub judice* and warrant a finding that the complainant's statements were sufficiently truthful and reliable for the purposes of establishing probable cause.

Furthermore, the description given by the complainant was fairly detailed to support a finding of probable cause. According to the testimony of Sergeant Williams, the complainant described his assailant as a large African American male with a distinct growth of hair on his face, wearing dark clothing. Trans., D.I. 15 at 4. Sergeant Williams also testified that the complainant identified the assailant as "Acay Lampkins" and that the complainant informed him that Acay Lampkins had fled the scene in "an older model black Camaro

that had some damage to the rear, and it was loud, the muffler was off of it." *Id.* Patrolmen Bailey and Rhoades testified that the complainant informed them: (1) that the complainant had been threatened at gun point by a large African American male wearing dark clothes, (2) that the assailant's name was "Acay", and (3) that the assailant had fled the scene in a black Camaro. *Id.* at 27–28, 37, 61.

There was also substantial independent police verification to corroborate the anonymous complainant's statements. Sergeant Williams and Patrolmen Bailey and Rhoades immediately conducted an area search to locate the alleged assailant. Approximately four minutes after interviewing the complainant, Sergeant Williams happened upon an older model black Camaro near the scene of the alleged incident. Both the car and the driver matched the description given by the complainant. Moreover, Sergeant Williams recognized the driver as Acay Lampkins. *Id.* at 7. Williams had known Lampkins for some fifteen years and knew what he looked like. *Id.* at 5; *Cf. Illinois v. Gates*, 462 U.S. at 244–45, 103 S.Ct. at 2335–36. ("It is enough for the purposes of assessing probable cause, that "corroboration through other sources of information reduced the chances of a reckless or prevaricating tale," thus providing a substantial basis for crediting the hearsay [statements of an anonymous informant].").

Finally, there existed a significant amount of information regarding Acay Lampkins which the police obtained from sources other than the complainant that adds to the total mix of information possessed by the police and further supports the conclusion that the police possessed probable cause. As stated above, Sergeant Williams was familiar with Acay Lampkins. He testified that the description given to him by the complainant comported with his knowledge of Lampkins' physical appearance and Lampkins' criminal history. Moreover, another officer, Craig Mayo, radioed to Patrolmen Bailey and Rhoades and informed them that he was familiar with Acay Lampkins, that he knew that Lampkins drove an older model black Camaro,

and that he knew Lampkins was dangerous and had a reputation of resisting arrest. *Id.* at 62.

These same considerations warrant a finding that the police also possessed probable cause to search the black Camaro. The police may conduct a warrantless search of an automobile when they possess probable cause to believe that the automobile contains instrumentalities or fruits of the crime. *Chambers v. Maroney*, 399 U.S. 42, 48–52, 90 S.Ct. 1975, 1979–82, 26 L.Ed.2d 419 (1970). The complainant informed the police that his alleged assailant, whom he identified as Acay Lampkins, had threatened him at gun point and then drove off in an older model black Camaro without a muffler. Shortly thereafter, when the police converged upon Lampkins, they had probable cause to believe that the instrumentality of the crime, the gun, was in the black Camaro. Under the facts of the case *sub judice*, the Court holds that the search of the black Camaro did not run afoul of the Fourth Amendment's prohibition against unreasonable searches and seizures.

Accordingly, for the reasons set forth above the Court holds that probable cause existed to seize Lampkins and to search the black Camaro. An order consistent with this opinion shall issue forthwith.