UNITED STATES of America, Plaintiff,

v.

Edward C. McCOY and David
L. Odom, Defendants.

Crim. A. No. 93–05–JLL.

United States District Court,
D. Delaware.

May 19, 1993.

468

William C. Carpenter, Jr., U.S. Atty., and Edmond Falgowski, Asst. U.S. Atty., Dept. of Justice, Wilmington, DE, for plaintiff.

Edmund D. Lyons, Jr., of Aerenson, Ferrara & Lyons, Wilmington, DE, for defendant Edward C. McCoy.

## OPINION

LATCHUM, Senior District Judge.

## I. INTRODUCTION

On January 26, 1993, the grand jury for the District of Delaware returned an indictment against defendants, Edward C. McCoy (hereinafter "defendant McCoy" or "defendant") and David L. Odom, charging them with: (1) four counts of knowingly providing false information in connection with the purchase of ten firearms in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(1)(B);[1] and (2) one count of conspiring to transport and transporting the aforesaid firearms in interstate commerce without a license in violation of 18 U.S.C. § 371 and 18 U.S.C. § 922(a)(3).[2] (Docket Item ["D.I."] 1.) Before the Court is defendant McCoy's motion pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure to suppress the introduction into evidence of one of the ten firearms referred to in the indictment, a .25 caliber semi-automatic Titan handgun, serial number ED90202, and certain incriminating statements made by defendant McCoy concerning that handgun. (D.I. 10.)

Both the handgun and the incriminating statements were obtained by the Yonkers Police Department. Defendant McCoy contends that the handgun and the incriminating statements constitute the fruit of an unreasonable search and seizure conducted by the Yonkers police in violation of his Fourth Amendment rights, and are therefore inadmissible under the exclusionary rule.[3] A suppression hearing was held by the Court on April 7, 1993. Thereafter, the Court received letter memoranda from the parties.

At the suppression hearing, the Court was informed by the parties for the first time that the aforesaid handgun and incriminating statements had been suppressed by the New York State County Court for Westchester County on the grounds that both had been

---

1. Title 18 of the United States Code, section 922(a)(6) provides that:

(a) It shall be unlawful—
(6) for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter....

18 U.S.C. § 922(a)(6). Section 924(a)(1)(B) of that same Title imposes a maximum penalty of imprisonment for a period of five years and a $5,000 fine for a "knowing" violation of section 922(a)(6).

2. Title 18 of the United States Code, section 922(a)(3) states:

(a) It shall be unlawful—
(3) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or to receive in the State where resides ... any firearm purchased or otherwise obtained by such person outside that State....

18 U.S.C. § 922(a)(3). Section 371 of that same Title imposes criminal liability for conspiracy "[i]f two or more persons conspire ... to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy. .." 18 U.S.C. § 371.

3. The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The exclusionary rule is the judicially created remedy for an unreasonable search and seizure; it bars the introduction of the fruit of the unreasonable search and seizure into evidence in a criminal prosecution against the defendant whose Fourth Amendment rights have been violated by the unreasonable search and seizure. See generally Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Weeks v. U.S., 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). As then Judge Cardozo of the New York Court of Appeals explained, the essence of the exclusionary rule is that "[t]he criminal is to go free because the constable has blundered." People v. Defore, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926).

obtained in violation of defendant McCoy's rights under New York State law. *People v. McCoy*, No. 91–1913 (N.Y. Westchester County Ct. October 13, 1992). Prior to his indictment by the grand jury for the District of Delaware, defendant McCoy was charged with possession of the aforesaid handgun without a permit in violation of New York State law. The Westchester County Court held a suppression hearing on September 22, 1992, and thereafter, on October 13, 1992, ruled that the aforesaid handgun and incriminating statements were inadmissible because the conduct of the Yonkers police in obtaining them violated McCoy's rights under New York State law. It is undisputed and the Court so finds that no agents or officials of the United States took part in the New York State prosecution of defendant McCoy.

As a threshold matter, it should be noted that the Westchester County Court's suppression of the handgun and incriminating statements does not estop the United States from contesting McCoy's instant motion to suppress. The reason for this conclusion lies in the federal system of government, which provides for dual sovereignty:

> The states and the national government are distinct political communities, drawing their separate sovereign power from different sources, each from the organic law that established it. Each has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses. When a single act violates the laws of two sovereigns, the wrongdoer has committed two distinct offenses.

*United States v. Davis*, 906 F.2d 829, 832 (2d Cir.1990). Accordingly, "collateral estoppel never bars the United States from using evidence previously suppressed in a state proceeding in which the United States was not a party." *Id.* (quoting *United States v. Panebianco*, 543 F.2d 447, 456 (2d Cir.1976)), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977).

When, in the course of a federal prosecution, the defendant moves to suppress evidence on the grounds that it constitutes the fruit of an unreasonable search and seizure conducted in violation of his Fourth Amendment rights, and that evidence has been suppressed in a prior state prosecution, the district court "must make an independent inquiry" into whether or not the police conduct violated the defendant's Fourth Amendment rights:

> In determining whether or not there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state may have countenanced, nor diminished by what another may have colorably suppressed.

*Elkins v. United States*, 364 U.S. 206, 223–24, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960); *United States v. Agee*, 597 F.2d 350, 360 (3d Cir.1979), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *United States v. Bedford*, 519 F.2d 650, 654 (3d Cir.1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976). The Court will proceed to this task.

## II. FINDINGS OF FACT

In accordance with Federal Rule of Criminal Procedure 12(e), which requires the district court to state on the record its essential findings of fact, the Court hereby makes the following findings of fact. On the evening of September 24, 1991, Officer Kenneth Held of the Yonkers Police Department was stationed at Midland Avenue, in an unmarked police car, monitoring traffic with a radar detector. (Transcript of the Suppression Hearing, [hereinafter referred to as "Tr."], D.I. 13 at 3–4.) Midland Avenue traverses a residential area and is designated as a "no-through-trucking" zone. Section 1110(a) of the New York State Vehicle and Traffic Law prohibits the driving of trucks in "no-through-trucking" zones. *Id.* A sign located at the intersection of Midland and McClain avenues, roughly one-quarter mile south of Officer Held's position, clearly alerts passers-by that Midland Avenue is a "no-through-trucking" zone. *Id.* at 4. At approximately 7:00 P.M., Officer Held observed a flatbed tow truck traveling northbound on Midland

Avenue in clear violation of the "no-through-trucking" proscription. The tow truck was hauling a 1987 four-door Mercedes Benz, with tinted windows and no license plates. Officer Held activated his lights and siren and drove off in pursuit. *Id.* While in pursuit, Officer Held detected movement in the Mercedes Benz, but dismissed this observation as improbable. *Id.* at 8.

The tow truck driver then pulled off to the side of the road. Officer Held exited his car and approached the cab of the tow truck. *Id.* at 5. He addressed the driver, requested his driver's license and registration, and informed him that he was in violation of the "no-through-trucking" law. Officer Held also inquired as to whether the driver had any business in the area. The driver responded that he did not. *Id.* at 5.

Suspecting that the Mercedes Benz was stolen, Officer Held asked the driver if he had any documentation demonstrating his rightful possession of the Mercedes Benz, such as a manifest or contract. *Id.*[4] The driver answered that the owner of the Mercedes Benz was seated in the car and that he would be able to provide the requested documentation. *Id.* at 5. Officer Held then studied the Mercedez Benz and determined that there was at least one person, and possibly more, seated in the Mercedes Benz. *Id.* at 7–8.

After this exchange with the driver of the tow truck, Officer Held returned to his car. Out of concern for his personal safety, he radioed for back-up. *Id.* at 8–9. Within minutes, two or three Yonkers police cars arrived on the scene. *Id.* at 9. Including Officer Held, there were now six police officers present. The officers took positions on either side of the flatbed tow truck. *Id.* at 10. The officers ordered the driver of the tow truck to remain seated in the cab and ordered the occupants of the Mercedes Benz to exit. *Id.* at 9.

The two front doors of the Mercedes Benz opened. Defendant McCoy alighted from the driver's side. A second person alighted from the passenger's side. *Id.* at 11. One of the police officers opened the back door on the passenger's side and called out that there was a third person lying on the back seat. The officers then opened the back door on the driver's side and removed the third individual from the Mercedes Benz. Defendant McCoy and his two companions were then secured at a distance from the flatbed tow truck. At all times thereafter the four doors of the Mercedes Benz remained open. *Id.* at 12.

Officer Held then approached defendant McCoy and asked him if he owned the Mercedes Benz. McCoy replied that he was the owner. *Id.* at 25. Officer Held then asked McCoy if he had any documentation demonstrating that he was the rightful owner of the Mercedes Benz. *Id.* 25–26. McCoy produced a registration card which indicated that he was the owner of a Mercedes Benz. *Id.* at 26–27. Inspection of the registration card alone did not enable Officer Held to determine whether McCoy did in fact own the Mercedes Benz atop the flatbed. The Mercedes Benz atop the flatbed did not have any license plates to compare with the license plate information contained on the registration card. *Id.* at 26.

Officer Held climbed onto the flatbed in order to compare the vehicle identification number ("VIN") on the registration card with the VIN on the windshield of the Mercedes Benz. *Id.* at 13. Because of the darkness, Officer Held used his flashlight to illuminate the windshield. Officer Held then deciphered the entire VIN from the exterior of the Mercedes Benz. *Id.* The VIN on the windshield matched the VIN on the registration card produced by McCoy. *Id.* at 28. Officer Held then returned to his car and radioed the VIN to Yonkers Police Headquarters in order to determine whether the Mercedes Benz was reported stolen. *Id.* at 14. It should be noted that the registration card produced by defendant did not enable Officer Held to ascertain whether defendant was Edward C. McCoy, the person named on

---

4. At the suppression hearing held by this Court, Officer Held testified that he had received special training in the detection of stolen vehicles and that the Yonkers Police Department had circulated various memoranda to its officers in order to "crack[ ] down on the auto repossessors and persons using tow trucks to steal cars...." (Tr., D.I. 13 at 6.)

the registration card as the owner of the Mercedes Benz. There is no evidence in the record that defendant supplied Officer Held with any personal identification demonstrating that he was Edward C. McCoy, the person named on the registration card as the owner of the Mercedes Benz. In short, without having obtained any personal identification from defendant McCoy, Officer Held could not determine if the defendant was "the real McCoy."

During the seven to eight minutes that it took headquarters to check the VIN, Officer Held made a cursory inspection of the Mercedes Benz for weapons. *Id.* at 14–15. Officer Held conducted this inspection from the street by shining his flashlight into the Mercedes Benz. The Mercedes Benz was situated on the flatbed-tow truck such that the bottom of its interior compartment was approximately five feet above the ground. As stated above, the doors of the Mercedes remained opened, thus exposing the interior of the automobile. *Id.* at 14–15, 29.

While scanning the interior of the Mercedes Benz with his flashlight, Officer Held observed an opened black book bag behind the driver's seat. *Id.* at 15, 30. Certain of the bag's contents had spilled out onto the floor and Officer Held shined his flashlight into the bag to obtain a better view of its contents. *Id.* at 30–31. Officer Held observed a "silver and brass metallic object, consistent with the shape of a handgun." *Id.* at 15. He then jumped onto the flatbed and entered the Mercedes Benz to retrieve the black book bag. The black book bag contained a loaded .25 caliber Titan semi-automatic handgun, serial number ED90202. *Id.* 16–17. At no time prior to retrieving the black book bag did Officer Held enter the interior of the Mercedes Benz; he remained standing on the street, leaning over the flatbed of the tow truck, shining his flashlight into the interior of the Mercedes Benz.[5]

Shortly after Officer Held seized the handgun, McCoy and his two companions were arrested. *Id.* at 17. Officer Held read the

5. Defense counsel contends that Officer Held leaned *into the Mercedes Benz* in order to inspect its interior. (D.I. 15.) In support of this contention, defense counsel relies on the express finding of the Westchester County Court that Officer Held leaned into the Mercedes Benz. *People v. McCoy*, No. 91–1913 at 3. The United States Attorney counters that the Westchester County Court's finding that Officer Held leaned into the Mercedes Benz is unsupported by the record of the Westchester County Court suppression hearing and the record of this Court's independent suppression hearing. (D.I. 16.) This Court agrees with the Government's position. At the suppression hearing held by this Court, Officer Held testified that at all times while scanning the interior of the Mercedes Benz with his flashlight Officer Held remained standing on the street and did not enter the Mercedes Benz. (Tr., D.I. 13 at 15.) Furthermore, the Westchester County Court's finding of fact is inconsistent with the factual record before it. Officer Held testified before the Westchester County Court that he did not enter the Mercedes Benz prior to retrieving the black book bag. (D.I. 15, Appendix ["App."] at 28.) In an effort to clarify this factual issue, counsel asked Officer Held to reconstruct precisely where he was positioned when he peered into the Mercedes Benz. *Id.* at 32–33. This in-court experiment substantiated Officer Held's prior testimony:

    MR. BENDER: if I may suggest, with your Honor's permission, *maybe we could use the*

*back railing of the witness chair as the flatbed truck?*
    THE COURT: Well, then the Officer will have to come up to the steps so as to get to the top of the railing.
    MR. BENDER: Well, whatever the Officer deems appropriate, we could we [sic] describe that on the record. Your Honor, would you care to describe that?
    THE COURT: *The witness is leaning against the railing that's in back of the witness chair, he's got his left arm raised and he's leaning forward on the railing.*
*Id.* (emphasis added). Mr. Bender's in-court experiment established that the witness chair represented the edge of the flatbed tow truck. Accordingly, the Westchester County Court's description of Officer Held's posture indicates only that Officer Held was leaning on the edge of the flatbed tow truck, not that he was leaning into the Mercedes Benz. However, with no additional evidence on the record, the Westchester County Court found that Officer Held viewed the black book bag and its contents while leaning into the Mercedes Benz. One possible explanation for the inaccuracy in the Westchester County Court's finding of fact is supplied in the record of its suppression hearing. There is some suggestion on the record that the Westchester County Court did not wait until a transcript could be provided before making its findings of fact and conclusions of law, and instead, relied on its own notes taken during the suppression hearing. *Id.* at 146–47.

three men their *Miranda* rights. *Id.* at 18–19. While his companions were being placed into a nearby police car, McCoy spontaneously blurted out that he owned the handgun, that his companions were unaware that the handgun was in the Mercedes Benz, and that he had "found" the gun in the Bronx, approximately two weeks before. *Id.* at 19–20. At the time McCoy made these utterances, he did not appear to be under the influence of drugs or alcohol. *Id.* at 20.

The defendant was charged by the State of New York with possession of the .25 caliber Titan semi-automatic handgun without a permit. *Id.* at 21. The Westchester County Court ruled that the .25 caliber Titan semi-automatic handgun and McCoy's incriminating statements were inadmissible on the grounds that the Yonkers police officers had violated McCoy's rights under New York State law. *People v. McCoy,* No. 91–1913 (N.Y. Westchester County Ct. October 13, 1992).[6] There were no federal law enforcement officers nor federal prosecutors involved in the Westchester County Court proceeding.

## III. CONCLUSIONS OF LAW

### A. *Discussion*

The Government seeks to justify the warrantless seizure of the handgun from the Mercedes Benz on the basis of the plain-view doctrine. Recently, in the case of *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), the Supreme Court revisited the plain-view doctrine which had emerged in the wake of its plurality opinion in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The Court in *Horton* refined the plain-view doctrine, holding that the Government must demonstrate that four elements were present at the time of the warrantless seizure for the

seizure to be valid under the plain-view doctrine: (1) the officer must not have violated the defendant's Fourth Amendment rights in arriving at the vantage point from which the object seized could be plainly viewed; (2) the object seized must have been in plain view; (3) the incriminating character of the object seized must have been immediately apparent; and (4) the officer must have had a lawful right of access to the object seized. *Id.* at 136–37. For the reasons stated more fully below, the Court concludes that the Government has satisfied its burden of proving the existence of the four elements required for a valid plain-view seizure.

1. Officer Held Did Not Violate Defendant McCoy's Fourth Amendment Rights In Arriving At The Vantage Point From Which The Evidence Could Be Plainly Viewed.

■ To determine whether or not Officer Held violated defendant McCoy's Fourth Amendment rights in arriving at the vantage point from which the evidence could be plainly viewed, the Court must consider: (a) whether Officer Held's stop and detention of the flatbed tow truck and its occupants was valid; (b) whether Officer Held's questioning of the driver of the flatbed tow truck regarding the Mercedes Benz was valid; (c) whether Officer Held's order to the occupants of the Mercedes Benz to alight from the vehicle was valid; (d) whether Officer Held's inspection of the VIN located on the exterior of the windshield of the Mercedes Benz was valid; and (e) whether Officer Held's detention of the occupants of the Mercedes Benz and the driver of the truck was within the scope and duration permitted under *Terry.* The Court will consider these issues *seriatim.*

6. A copy of the Westchester County Court's order is attached to the government's letter memorandum opposing McCoy's motion to suppress. D.I. 14. Specifically, the Westchester County Court ruled that Officer Held's inquiry into the ownership of the Mercedes Benz was in violation of New York State law because the only illegal activity observed by Officer Held was the operation of a flatbed tow truck in a "no-through trucking zone"; that illegal activity bore no relation to automobile theft, nor were the circumstances sufficiently suspicious to justify any inquiry into the ownership of the Mercedes Benz. *People v. McCoy,* No. 91–1913 at 5–6. Alternatively, the Westchester County Court ruled that even if Officer Held's inquiry into the ownership of the Mercedes Benz was lawful, Officer Held's subsequent "search" of the interior of the Mercedes Benz with his flashlight was not reasonably related in scope and intensity to his inquiry of ownership, and thus invalid under New York State law. *Id.* at 6.

In *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Supreme Court held that police officers may stop a vehicle and detain the vehicle and its occupants when the officers possess a reasonable, articulable suspicion that the vehicle or its occupants are in violation of the law. *Id.* at 663, 99 S.Ct. at 1401.[7] In the present case, Officer Held observed the flatbed tow truck traveling on a roadway designated as a "no through trucking" zone in violation of New York State law. Upon witnessing this traffic infraction, Officer Held possessed more than the requisite reasonable, articulable suspicion that the driver of the flatbed tow truck was in violation of the law. Indeed, Officer Held possessed probable cause that the driver of the tow truck had committed a traffic violation. *United States v. Kikumura*, 698 F.Supp. 546, 555 (D.N.J.1988), *aff'd in part, rev'd in part*, 918 F.2d 1084 (3d Cir.1990) (The court of appeals affirmed the district court's determination that the defendant-appellant's Fourth Amendment rights were not violated, but vacated the district court's sentence with instructions to resentence defendant-appellant.) Accordingly, Officer Held's stop and detention of the flatbed tow truck and its occupants was proper.

Once Officer Held stopped and detained the flatbed tow truck and its occupants, Officer Held's questioning of the driver was likewise proper. In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court held that during a lawful traffic stop, a police officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 439, 104 S.Ct. at 3150. The Supreme Court in *Berkemer* explained that "investigations into seemingly minor offenses sometimes escalate gradually into investigations into more serious matters" and that it would be improvident and "disruptive of law enforcement" to restrict a police officer's authority to question detainees during a routine stop for a traffic viola-tion. *Id.* at 431–32, 104 S.Ct. at 3146. In the present case, Officer Held suspected that the Mercedes Benz atop the flatbed was stolen. His suspicion was well-founded under the circumstances surrounding the stop. The Mercedes Benz, an expensive luxury car, was without any license plates; the tow truck hauling the Mercedes Benz was operating unlawfully in a residential area after dark; and Officer Held had detected movement in the Mercedes Benz prior to stopping the tow truck. Under these circumstances, Officer Held was permitted to question the driver of the flatbed tow truck to determine whether or not the vehicle was stolen.

Officer Held's subsequent order commanding the occupants of the Mercedes Benz to exit the vehicle was also proper under the circumstances of the present case. In *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the Supreme Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Id.* at 111 n. 6, 98 S.Ct. at 333 n. 6. In *Mimms*, the Court reached its holding by balancing the intrusion visited upon the personal liberty of the driver in being ordered to exit the automobile against the state's interest in protecting law enforcement officers from attack by suspects carrying concealed weapons in automobiles. *Id.* at 109–11, 98 S.Ct. at 332–33. The Court concluded that the intrusion visited upon the personal liberty of the driver of a lawfully stopped vehicle "is at most a mere inconvenience [and] cannot prevail when balanced against legitimate concerns for the officer's safety." *Id.* at 111, 98 S.Ct. at 333. The *Mimms* holding has been interpreted to apply with equal force to passengers of lawfully stopped vehicles. *See Michigan v. Long*, 463 U.S. 1032, 1047–48, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1982) ("In *Pennsylvania v. Mimms* ... we held that police may order *persons* out of an automobile during a

---

7. The Supreme Court's holding in *Delaware v. Prouse* was premised on the Court's prior decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, which had established the principle that the police may stop and briefly detain a suspect in the absence of probable cause, if, and only if, the police possess a reasonable, articulable suspicion that criminal activity is afoot.

stop for a traffic violation...." (emphasis added)); *Rakas v. Illinois,* 439 U.S. 128, 155 n. 4, 99 S.Ct. 421, 436, 58 L.Ed.2d 387 (1978) (Powell, J. concurring) ("Last Term, this Court determined in *Pennsylvania v. Mimms* ... that passengers in automobiles have no Fourth Amendment right not to be ordered from their vehicle, once a proper stop is made."); *United States v. Wallace,* Nos. 91–5946/47/48, 1992 WL 310268, at * 2, 1992 U.S.App. LEXIS 28729, at * 5–6 (6th Cir. October 26, 1992) ("It is permissible to ask passengers to step out of a vehicle during a *Terry* stop...." (citing *Mimms* )); *see also United States v. Belle,* 593 F.2d 487, 490–96 (3d Cir.1979), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 277 (1979) (DEA agents made a lawful *Terry* stop of the Cadillac in which defendant-appellant was a passenger and properly ordered him out of the car. (citing *Mimms* )); *cf. United States v. Woodall,* 938 F.2d 834, 837 (8th Cir.1991) (Defendant-appellant, a passenger, was lawfully ordered out of the automobile following a lawful stop for traffic offense. (citing *Mimms* )); *cf. United States v. Miller,* 507 F.Supp. 1347, 1352 (D.Md.1981) ("The fact that [the officer] executed an investigatory stop while defendant was riding in a public bus, rather than while riding in a private vehicle or walking along the street, does not render the stop unreasonable.... [I]t would make little sense to find that defendant had greater privacy interests when riding on public transportation than he would have had if he were a passenger in a private vehicle." (citing *Mimms* )). Such an extension of *Mimms* is entirely consistent with the balancing test utilized by the Supreme Court in the *Mimms* opinion. The intrusion upon the passenger of a lawfully stopped vehicle in being ordered to exit the vehicle is minimal, when weighed against the state's substantial, if not compelling, interest in protecting law enforcement officers. Moreover, it would be incongruous to permit an officer to order the driver out of his vehicle pursuant to a lawful stop in order to diminish the likelihood that the officer will be attacked with a concealed weapon, but not to permit the officer to order the passengers out of a lawfully stopped vehicle, when those passengers present the same risk of attack and have the same access to concealed weapons.

Application of these principles to the facts of the present case reveals that Officer Held's command to the occupants of the Mercedes to exit the vehicle was proper. As explained above, Officer Held's stop of the flatbed tow truck was perfectly lawful. Thus, his subsequent command to the occupants of the Mercedes Benz was a proper exercise of his discretion under the rule in *Pennsylvania v. Mimms.*

Officer Held's inspection of the VIN located on the exterior of the windshield of the Mercedes Benz was also proper. In *New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986), the Supreme Court explained, "because of the important role played by the VIN in the pervasive governmental regulation of the automobile and the efforts by the Federal Government to ensure that the VIN is placed in plain view, we hold that there ... [is] no reasonable expectation of privacy in the VIN." *Id.* at 114, 106 S.Ct. at 966. Because there is no reasonable expectation of privacy in the VIN, Officer Held's inspection of the VIN did not constitute a "search" triggering the protections of the Fourth Amendment. *Id.* at 113–14, 106 S.Ct. at 966. Accordingly, Officer Held's inspection of the VIN was proper.

Finally, the seven to eight minute detention of defendant McCoy, his two companions, and the driver of the flatbed tow truck did not exceed the limited duration and scope of an investigatory detention under *Terry v. Ohio* and *Delaware v. Prouse.* As this Court explained in *United States v. Lampkins,* 811 F.Supp. 164 (D.Del.1993):

Although the precise parameters of a *Terry* stop are incapable of facile bright line delineation because "[t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case.... [t]his much is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."

*Id.* at 169, quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). By radioing in the VIN on the Mercedes Benz to the Yonkers Police Department Headquarters, Officer Held employed the least intrusive means reasonably available to promptly verify or dispel his suspicion that the Mercedes Benz was stolen. Officer Held's detention of defendant McCoy, his two companions, and the driver of the flatbed tow truck lasted only seven to eight minutes, well within the boundaries of a proper *Terry* stop.

In sum, the Court concludes Officer Held did not violate defendant McCoy's Fourth Amendment rights in arriving at the vantage point from which he observed the handgun.

### 2. The Handgun Was In Plain View When Officer Held Seized It.

■ In the present case, the evidence demonstrates that Officer Held never entered the interior of the Mercedes Benz before observing the handgun. Officer Held merely scanned the interior of the Mercedes Benz with the aid of his flashlight while standing on the street and leaning against the flatbed of the tow truck. The doors of the Mercedes Benz were left wide open after defendant McCoy and his companions alighted from the vehicle. Thus, the interior of the Mercedes Benz was exposed to plain view.

The mere fact that Officer Held observed the handgun in the black book bag with the assistance of his flashlight does not alter this conclusion. The plurality opinion in *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), is instructive on this point. There, in sustaining a warrantless seizure under the plain view doctrine, the plurality concluded that the police officer's use of a flashlight to illuminate the interior of respondent's automobile at a routine license checkpoint did not violate the respondent's Fourth Amendment rights:

> It is ... beyond dispute that ... [the officer's] action in shining his flashlight to illuminate the interior of ... [respondent's] car trenched upon no right secured by the Fourth Amendment. The Court said in *United States v. Lee,* 274 U.S. 559, 563 [47 S.Ct. 746, 748, 71 L.Ed. 1202] (1927): "[The] use of a searchlight is com-

parable to the use of a marine glass or a field glass. It is not prohibited by the Constitution." Numerous other courts have agreed that the use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection.

*Texas v. Brown,* 460 U.S. at 739–40, 103 S.Ct. at 1542; *see also United States v. Dunn,* 480 U.S. 294, 305, 107 S.Ct. 1134, 1140, 94 L.Ed.2d 326 (1987) (citing *Texas v. Brown*); *see also United States v. Baker,* 754 F.Supp. 445, 447 (E.D.Pa.1991) ("A visual inspection by a law enforcement officer from a vantage point where the officer had a right to be does not constitute a search for the purposes of the Fourth Amendment, even when aided by means such as a flashlight.").

### 3. The Incriminating Character Of The Handgun Seized Was Immediately Apparent To Officer Held.

■ Defense Counsel argues that the incriminating character of the handgun was not "immediately apparent" to Officer Held for two reasons. (D.I. 15 at 3.) "First ... [Officer] Held did not see a gun but rather 'a metallic object consistent with the shape of a handgun'...." *Id.* Second, "the mere ... possession of a gun alone does not conclusively establish commission of a crime under New York [State] law" because New York State law only proscribes the possession of handguns without a permit. *Id.*

Defense Counsel's contentions evince a fundamental misconception of the "immediately apparent" prong of the plain view doctrine. The "immediately apparent" prong does not impose a requirement that the officer viewing the object "know" that the object observed is contraband or an instrumentality of a crime. All that is required for a valid warrantless seizure under the plain-view doctrine is that the officer possess probable cause. *Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987). As the plurality in *Texas v. Brown* explained:

> Decisions by this Court since *Coolidge* indicate that the use of the phrase "immediately apparent" was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of cer-

tainty as to the incriminating character of evidence is necessary for an application of the "plain view" doctrine....

Plainly, the Court did not view the "immediately apparent" language of *Coolidge* as establishing any requirement that a police officer "know" that certain items are contraband or evidence of a crime.... We think ... requiring probable cause for seizure in the ordinary case, is consistent with the Fourth Amendment and we reaffirm it here.

As the Court frequently has remarked, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," ... that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.

*Texas v. Brown,* 460 U.S. at 741–42, 103 S.Ct. at 1543. Thus, when viewed in conjunction with the probable cause requirement, all the "immediately apparent" prong requires is that upon observing the object it becomes immediately apparent to the officer that he has probable cause to seize the object. *See Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983) (citing *Texas v. Brown* ); *see also United States v. Clark,* 617 F.Supp. 693, 696 (E.D.Pa.1985), *aff'd w.o. opinion,* 791 F.2d 922 (3d Cir.1986) (citing *Texas v. Brown* ).

In the present case, the "immediately apparent" prong is satisfied. When Officer Held observed the handgun, he already possessed a reasonable, articulable suspicion that the Mercedes Benz had been stolen. The Mercedes Benz, an expensive luxury car, had no license plates and was being hauled under cover of darkness through a residential area on a flatbed tow truck. Furthermore, the driver of the tow truck informed Officer Held that he had no business in the vicinity. The additional facts that two individuals alighted from the Mercedes Benz and that a third was discovered prostrate on the back seat also aroused Officer Held's suspicions. Given these facts, upon observing the handgun, Officer Held had probable cause to

believe that the handgun was either evidence of a crime or an instrumentality of a crime.

It is immaterial that Officer Held did not know with certainty whether the handgun was an instrumentality of a crime, or whether the Mercedes Benz was stolen. Exactitude is not demanded of the police, merely probable cause. The fact that mere possession of a handgun alone is not a crime also has no bearing on the issue of whether the incriminating nature of the handgun was "immediately apparent." An officer need not prove all the elements of a crime beyond a reasonable doubt before executing a seizure. All the officer must possess is probable cause. In the present case, it was highly probable that the handgun may have been evidence of, or the instrumentality of, a crime.

### 4. Officer Held Had A Lawful Right Of Access To The Handgun.

■ As stated above, upon observing the handgun inside the black book bag on the floor of the Mercedes Benz, Officer Held had probable cause to search the book bag for the handgun. Once Officer Held possessed probable cause, his subsequent entry into the Mercedes to retrieve the handgun was permissible. Under the Supreme Court's decision in *United States v. Ross,* 456 U.S. 798, 824–25, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982), when the police possess probable cause to search a lawfully stopped vehicle, they may enter the vehicle without a warrant and may search the vehicle and any containers therein that may conceal the object of the search. Accordingly, Officer Held possessed a lawful right of access to the handgun.

### IV. SUMMARY

For the reasons set forth above, the Court holds that the seizure of the .25 caliber semi-automatic Titan handgun, serial number ED90202, was justified under the plain-view doctrine. Therefore, defendant McCoy's motion to suppress both the aforesaid handgun and the incriminating statements made by defendant McCoy concerning that handgun

will be denied. An order consistent with this opinion shall issue forthwith.